# IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF MONTANA
### MISSOULA DIVISION

DEBRA KUBU,

               Plaintiff,

vs.

CAROLYN W. COLVIN, Acting
Commissioner of Social Security,

               Defendant.

CV 14-171-M-DLC-JCL


FINDINGS &
RECOMMENDATION

Plaintiff Debra Kubu brings this action under 42 U.S.C. § 405(g) seeking judicial review of the decision of the Commissioner of Social Security denying her application for disability insurance benefits under Title II of the Social Security Act, 42 U.S.C. §§ 401-433. Kubu alleges disability since July 14, 2008, due to depression, anxiety, post traumatic stress disorder ("PTSD"), learning disabilities, dyslexia, and attention deficit hyperactivity disorder ("ADHD"), kidney cancer (now resolved), hypothyroidism, hypertension, insomnia, and migraine headaches. (Tr. 429). Kubu's claim was denied initially and on reconsideration. (Tr. 171-79 ). Kubu appeared with counsel at an administrative hearing in front of an administrative law judge (ALJ) on January 14, 2013. (Tr. 63-149 ). On February

15, 2013, the ALJ issued a decision finding Kubu not disabled within the meaning of the Act. (Tr. 23-39 ). The Appeals Council denied Kubu's request for review, making the ALJ's decision the agency's final decision for purposes of judicial review. (Tr. 1-6). Jurisdiction vests with this Court pursuant to 42 U.S.C. § 405(g).

Kubu was 46 years old at the time of her alleged onset date, and 51 years old at the time of the ALJ's decision.

## I.    Standard of Review

This Court's review is limited. The Court may set aside the Commissioner's decision only where the decision is not supported by substantial evidence or where the decision is based on legal error. *Bayliss v. Barnhart*, 427 F.3d 1211, 1214 n.1 (9th Cir. 2005); *Thomas v. Barnhart*, 278 F.3d 947, 954 (9th Cir. 2002). Substantial evidence is "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Richardson v. Perales*, 402 U.S. 389, 401 (1971); *Widmark v. Barnhart,* 454 F.3d 1063, 1070 (9th Cir. 2006).

"The ALJ is responsible for determining credibility, resolving conflicts in medical testimony, and resolving ambiguities." *Edlund v. Massanari*, 253 F.3d 1152, 1156 (9th Cir. 2001). This Court must uphold the Commissioner's findings "if supported by inferences reasonably drawn from the record." *Batson v.*

*Commissioner of Social Security Administration*, 359 F.3d 1190, 1193 (9th Cir. 2004). "[I]f evidence exists to support more than one rational interpretation," the Court "must defer to the Commissioner's decision." *Batson*, 359 F.3d at 1193 (*citing Morgan v. Commissioner*, 169 F.3d 595, 599 (9th Cir. 1999). This Court "may not substitute its judgment for that of the Commissioner." *Widmark*, 454 F.3d at 1070 (*quoting Edlund*, 253 F.3d at 1156).

## II.   Burden of Proof

To establish disability, a claimant bears "the burden of proving an 'inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which...has lasted or can be expected to last for a continuous period of not less than 12 months.'" *Batson*, 359 F.3d at 1193-94 (*quoting* 42 U.S.C. § 423(d)(1)(A)).

In determining whether a claimant is disabled, the Commissioner follows a five-step sequential evaluation process. 20 C.F.R. § 404.1520. The claimant bears the burden of establishing disability at steps one through four of this process. *Burch v. Barnhart*, 400 F.3d 676, 679 (9th Cir. 2005). At the first step, the ALJ will consider whether the claimant is engaged in "substantial gainful activity." 20 C.F.R. § 404.1520(a)(4)(I). If not, the ALJ must determine at step two whether the claimant has any impairments that qualify as "severe" under the regulations. 20

C.F.R. § 404.1520(a)(4)(ii). If the ALJ finds that the claimant does have one or more severe impairments, the ALJ will compare those impairments to the impairments listed in the regulations. 20 C.F.R. § 404.1520(a)(4)(iii). If the ALJ finds at step three that the claimant has an impairment that meets or equals a listed impairment, then the claimant is considered disabled. 20 C.F.R. § 404.1520(a)(iii).

If, however, the claimant's impairments do not meet or equal the severity of any impairment described in the Listing of Impairments, then the ALJ must proceed to step four and consider whether the claimant retains the residual functional capacity (RFC) to perform his or her past relevant work. 20 C.F.R. § 404.1520(a)(4)(iv). If the claimant establishes an inability to engage in past work, the burden shifts to the Commissioner at step five to establish that the claimant can perform other work in the national economy. 20 C.F.R. § 404.1520(a)(4)(v).

## III. <u>Discussion</u>

The ALJ found at step one that Kubu meets the insured status requirements of the Act through September 30, 2015, and had not engaged in substantial gainful activity since her alleged onset date. (Tr. 25). At step two, the ALJ found that Kubu had the following severe impairments: obesity, back disorder, left knee osteoarthritis, ADD, PTSD, depression, and personality disorder. (Tr. 25). The

ALJ concluded at step three that Kubu did not have an impairment or combination of impairments that met or medically equaled any impairment described in the Listing of Impairments. (Tr. 26). The ALJ also found that Kubu's "medically determinable impairments could reasonably be expected to cause the alleged symptoms," but her "statements concerning the intensity, persistence, and limiting effects of th[o]se symptoms" were not entirely credible. (Tr. 31). The ALJ concluded that Kubu had the residual functional capacity to perform a reduced range of light work. (Tr. 28). Based on that residual functional capacity assessment, the ALJ found at step four that Kubu could perform past relevant work as a switchboard operator. (Tr. 37). The ALJ made alternative findings at step five and concluded that Kubu was also capable of performing light work as an office helper, counter clerk, or collator.

### A. Other Medical Sources

Kubu argues the ALJ erred by not giving more weight to the opinions of licensed clinical social worker Carleen Grussling, and nurse practitioner Irene Walters.

### 1. Carleen Grussling

Carleen Grussling is a licensed clinical social worker who met with Kubu approximately once or twice a month between March 2009 and November 2012.

(Tr. 755-56, 862-63, 879-943, 946-53, 1034-37).  On September 11, 2012,

Grussling wrote a letter summarizing her observations of the functional limitations

caused by Kubu's mental health symptoms.  (Tr. 851).  She explained that Kubu

was "working at full capacity," 14 hours a week at a non-competitive job with a

supervisor who was willing to accommodate her slowness and deficits.  (Tr. 852).

Grussling wrote that Kubu was "unable to function at a higher capacity at this time

due to her learning deficits and the debilitating mental illness."  (Tr. 852-53).  She

said that Kubu "will continue to struggle with these issues and that the symptoms

will continue to interfere at a significant level for at least a number of year[s] if not

for the rest of her life."  (Tr. 853).  Kubu argues the ALJ should have given

Grussling's opinion more weight.

As a social worker, Grussling does not qualify as an acceptable medical

source.  20 C.F.R. §§ 404.1513(a),(d), 416.913(a),(d); SSR 06-3p.  Only

acceptable medical sources can render medical opinions.  SSR 06-3p; 20 C.F.R. §§

404.1527(a)(2), 416.927(a)(2).  Information from "other sources" may

nevertheless "provide insight into the severity of the impairment and how it affects

the individual's ability to function."  SSR 06-3p.  The ALJ must provide

"germane" reasons for discounting an "other source" opinion like Grussling's.

*Valentine v Commissoner SSA*, 574 F.3d 685, 694 (9th Cir. 2009); *Dodrill v.*

*Shalala*, 12 F.3d 915, 919 (9th Cir. 1993); *Jamerson v. Chater*, 112 F.3d 1064, 1067 (9th Cir. 1997). The ALJ should evaluate opinion evidence from "other sources," and in doing so consider such factors as how long the source has known the claimant, how frequently the source has seen the individual, whether the opinion is consistent with other evidence, how well the source explains the opinion, the degree to which the source presents relevant evidence to support the opinion, and whether the source has an area of expertise related to the individual's impairment. SSR 06-3p.

The ALJ provided a very detailed summary of Grussling's treatment notes in his written decision, and then addressed her September 2012 letter. (Tr. 32-34). As the ALJ's discussion reflects, Grussling noted on a number of occasions that Kubu was doing well and working part time. (See e.g. Tr. 32, 888, 892, 897-901, 903, 908-16). The ALJ reasonably found that Grussling's letter, including her statement that Kubu's symptoms would interfere with her ability to work for the rest of her life, was "markedly inconsistent" with her report only two months earlier in July 2012, at which time she wrote that Kubu "has been able to work full time in the past and probably could again." (Tr. 34, 941).

Kubu argues the ALJ overlooked the fact that after their next visit in August 2012, Grussling felt that Kubu was "not able to emotionally work more hours at

this time" due to her mental limitations.  (Tr. 942).   But the specific inconsistency noted by the ALJ was the fact that Grussling indicated in September 2012 that Kubu's symptoms would interfere with her ability to work for the rest of her life, but had written just two months earlier that Kubu would probably be able to work full time again in the future.

 The ALJ permissibly discounted Grussling's September 2012 letter regarding Kubu's inability to work full time little weight because it was not consistent with her treatment records.  *Bayless v. Barnhart*, 427 F.3d 1211, 1218 (9th Cir. 2005) (inconsistency with the medical evidence is a germane reason for discrediting lay witness evidence).

The ALJ also pointed out that when Grussling wrote the letter in September 2012, Kubu was going through "a period of significant turmoil," which included "ongoing divorce proceedings and financial stress related to the cessation of unemployment benefits."  (Tr. 34).  The ALJ found it significant that Grussling had not expressed similar concerns about Kubu's "ability to work more hours during the fall of 2010, when [Kubu] was reporting that she was working additional hours (and possibly three jobs) and applying for other work."  (Tr. 34). This too was a germane reason for giving Grussling's letter less weight.

Kubu points out that the medical expert, Dr. James Bruce, said at the

hearing that he did not see any significant inconsistencies between Grussling's letter and her treatment records. The ALJ acknowledged Dr. Bruce's testimony, but permissibly disagreed with his assessment and cited specific inconsistencies between Grussling's letter and her treatment records.

Kubu argues the ALJ overlooked the fact that Grussling wrote in August 2012 that Kubu was not able to work more than her current 14 hours a week. (Tr. 942). But the ALJ specifically mentioned Grussling's August 2012 treatment notes in his detailed summary of the treatment records, which reflect that Kubu's symptoms waxed and waned depending on various situational stressors. (Tr. 33). Grussling's records reflect what the ALJ recognized – that Kubu experienced periods of more severe psychological symptoms when she was experiencing stressful events in life like marital discord and family illness. With medication and counseling, Kubu's symptoms would improve. By and large, Grussling's records reflect that while Kubu's symptoms waxed and waned over time, she continued to work part time and do well with counseling and medication. (*See e.g.* 888, 892, 897-901, 903, 908-16, 924, 941).

  2. <u>Irene Walters</u>

Kubu argues that the ALJ did not provide germane reasons for rejecting a Mental Impairment Questionnaire completed by nurse practitioner Irene Walters.

(Tr. 840-48).  Walters saw Kubu six times between February 2011 and September 2012.  (Tr. 829-33, 836-37, 996-97, 999-1000, 1007-08).  In July 2012, Walters completed a Mental Impairment Questionnaire on which she indicated that Kubu would be absent from work more than three times each month.  Walters rated Kubu's mental ability to perform tasks associated with unskilled work as "poor to none" in 13 out of 15 categories, and "fair" in the two remaining categories.  (Tr. 845-46).  Walters further indicated that Kubu had marked difficulties with activities of daily living and maintaining social functioning, and constant deficiencies in concentration, persistence or pace.  (Tr. 847).

"[A] nurse practitioner working in conjunction with a physician constitutes an acceptable medical source, while a nurse practitioner working on his or her own does not." *Gomez v. Chater*, 74 F.3d 967, 970 (9th Cir. 1996).  Because there is no indication that Walters was being closely supervised by a physician or that her findings were endorsed by a physician, she does not qualify as an acceptable medical source and the ALJ could thus reject her opinion for germane reasons.

The ALJ provided several such reasons here.  Relying on Dr. Bruce's expert testimony, the ALJ first found that if Kubu's limitations were as severe as Walters suggested, she would not have been able to perform even the part-time job that she

has held since 2009.  (Tr. 36, 105-06).  The ALJ also relied on Dr. Bruce's expert opinion that the limitations identified by Walters were inconsistent with the results of objective mental health testing, like that conducted by examining psychologist Dr. James Wahlberg in March 2009.  (Tr. 106, 729-39).  Dr. Wahlberg conducted a battery of psychological tests, diagnosed Kubu with ADHD, and ultimately recommended that she consider finding a job with "a fairly high activity level and challenges that would tap into her excellent visual-motor skill," but avoid work requiring "fair amounts of reading, writing, and mathematics."  (Tr. 738-39).  The ALJ reasonably rejected the limitations identified by Walters based on Dr. Bruce's testimony and because they were not supported by the objective evidence.

Dr. Bruce additionally testified that if Kubu was impaired to the extent Walters suggested, she "would require a more intense treatment regimen."  (Tr. 106).  The ALJ reasonably relied on  Dr. Bruce's expert medical opinion over that of Walters, who was not an acceptable medical source.  And as the ALJ further found, Walters' July 2012 evaluation was not supported by her own treatment records, which often indicated that Kubu was "stable" and/or "doing well," that her mood was "positive" or "neutral" and that he had adequate memory, attention, and concentration.  (Tr. 36, 996-97, 999-1000, 829-30, 831-32, 836-37).  These

were sufficiently germane reasons for discounting the limitations identified by Walters in her July 2012 opinion.

**B.    Credibility**

Kubu argues the ALJ did not provide sufficiently clear and convincing reasons for finding her only partially credible.  If the ALJ finds "the claimant has presented objective medical evidence of an underlying impairment which could reasonably be expected to produce the pain or other symptoms alleged," and "there is no evidence of malingering, the ALJ can reject the claimant's testimony about the severity of her symptoms only by offering specific, clear and convincing reasons for doing so." *Lingenfelter v. Astrue*, 504 F.3d 1028, 1036 (9th Cir. 2007) (internal quotation marks and citations omitted).  Kubu met her initial burden because she provided evidence that she has underlying impairments that could reasonably be expected to produce some degree of pain and other symptoms, and the ALJ did not find that she was malingering.

Kubu testified that her various impairments caused her a number of physical and mental limitations.  The ALJ found that Kubu's testimony regarding her physical limitations was generally consistent with the medical records, and expressly gave that testimony great weight in finding Kubu capable of light level

work. (Tr. 31). To the extent Kubu testified that her mental symptoms and limitations were of debilitating severity, however, the ALJ found her not entirely credible for a number of reasons.

Kubu testified that she has an average of three bad days each week due to depression and anxiety, during which she spends 20 hours a day in bed and does not eat. (Tr. 83). As the ALJ pointed out, however, the medical expert Dr. James Bruce did not find any notations in the treatment records consistent with Kubu's testimony that she was essentially too depressed to eat or get out of bed three days a week. (Tr. 35). The ALJ discussed those underlying treatment records at length, noting for example that except for when Kubu was dealing with periodic situational stressors, treating psychologist Dr. Julia Bell consistently reported benign mental status examination findings and wrote that Kubu was doing well. (Tr. 32, 525-64; 816-32). The ALJ permissibly discounted Kubu's testimony based on Dr. Bruce's testimony and the lack of corroborating medical evidence. *See e.g. Burch v. Barnhart*, 400 F.3d 676, 681 (9th Cir. 2005) (the ALJ may consider the lack of medical evidence corroborating a claimant's testimony).

Kubu testified that after her alleged onset date she continued to work as a prep cook four days a week, for two and a half to four hours a day. (Tr. 75). She

stated that she would not be able work additional hours. (Tr. 76). As the ALJ noted, however, in September 2010 Kubu reported working three jobs, including her part time work as a prep cook, and in November 2010, Kubu started a new job doing home health care and was considering becoming a certified nurse aide. (Tr. 33, 909-12). While the home health aide job subsequently fell through, the ALJ reasonably found the fact that Kubu was looking for additional work undermined her testimony that she was unable to do anything more than her part-time work as a prep cook. (Tr. 33, 75-76).

The ALJ also questioned Kubu's testimony as to the severity of her symptoms based on evidence that she received unemployment compensation benefits after her alleged onset date. (Tr. 33). The ALJ properly relied on the fact that Kubu held herself out as capable of working even after her alleged onset date when assessing her credibility. *See Copeland v. Bowen*, 861 F.2d 536, 542 (9th Cir. 1988)(stating that a claimant who received unemployment insurance benefits apparently considered himself capable of working and held himself out as available for work).

The ALJ next noted that, according to Dr. Bruce, Kubu experienced "periods of symptom exacerbation due to failure to take medications or

'significant life crises or stressors.'" (Tr. 35). The ALJ acknowledged that Kubu's psychological symptoms temporarily worsened during periods of marital discord and family illness. The record also reflects that Kubu's symptoms sometimes worsened when she failed to take her medication. (Tr. 106). The ALJ permissibly found the fact that Kubu occasionally failed to follow her prescribed treatment undermined her credibility as to the extent of psychological symptoms. *See Smolen v. Chater*, 80 F.3d 1273, 1284 (9th Cir. 1996) (the ALJ may consider unexplained or inadequately explained failure to follow a prescribed course of treatment).

The Court thus finds the ALJ provides sufficiently clear and convincing reasons for finding Kubu's testimony as to the debilitating extent of her psychological symptoms only partially credible.

### C.    Vocational and Medical Expert Testimony

Psychologist Dr. James Bruce testified as a medical expert at Kubu's administrative hearing. (Tr. 103-127). He stated based on his review of the medical records that Kubu had no difficulties with activities of daily living, mild difficulties with social functioning, moderate restrictions with concentration, persistence and pace, and no episodes of decompensation of extended duration.

(Tr. 104).   Kubu's attorney then asked Dr. Bruce to review Walters' July 2012

mental functional capacity assessment and give his own opinion of Kubu's ability

to perform 25 functions associated with unskilled, semi-skilled, and skilled work

as set forth on the questionnaire.  (Tr. 113-19, 845-47).  Kubu's counsel explained

that "poor to none" meant no useful ability to function, "fair" meant a "15 percent

reduction" in the ability to perform the task, and "good" meant the ability to

function in a particular areas was "somewhat limited but satisfactory."  (Tr. 113-

15).

Working his way down the form using counsel's definitions of "fair" and

good, Dr. Bruce testified that Kubu's ability to function in 11 of the 16 areas

related to unskilled work was "good," and that she had "very good" ability in other

areas, including the ability to ask simple questions, request assistance, accept

instructions, and respond appropriately to criticism.   Dr. Bruce testified that

Kubu's ability to function in a total of eight areas, some of which related to

unskilled work and others to semi-skilled or skilled work, was "fair."  (Tr. 113-

125).  For example, Dr. Bruce testified that Kubu would have a "fair" ability to

perform tasks requiring interaction with the public, which the ALJ accounted for

by limiting Kubu to work involving brief and superficial interactions with two to

three members of the general public on an occasional basis. Dr. Bruce also rated

Kubu's ability to interpret verbal instructions as required for semi-skilled to

skilled work was "fair"to "poor", but rated her ability to deal with previously

learned tasks or those that could be learned through nonverbal means as "good."

Once again, the ALJ accounted for Dr. Bruce's opinion in finding that Kubu could

perform "occasional new learning, preferably done in a written format rather than

in a verbal format" and was "limited to work requiring no more than occasional

judgment and decision-making." (Tr. 28).

Kubu contends the ALJ violated her due process rights and failed to fully

develop the record because he would not allow her counsel to cross-examine the

vocational expert as to whether a hypothetical person with "fair" ability to

function in the eight areas identified by Dr. Bruce would be able to perform

substantial gainful activity. The Court disagrees.

A social security claimant has a right to due process. *Richardson v. Perales*,

402 U.S. 389, 401-02 (1971). Furthermore, an "ALJ in a social security case has

an independent "'duty to fully and fairly develop the record and to assure that the

claimant's interests are considered.'" *Tonapetyan v. Halter*, 242 F.3d 1144, 1150

(9th Cir. 2001) (*quoting Smolen v. Chater*, 80 F.3d 1273, 1288 (9th Cir. 1996)).

But that duty is triggered only when "there is ambiguous evidence or when the

record is inadequate to allow for proper evaluation of the evidence." *Mayes v Massanari*, 276 F.3d 453, 459-60 (9th Cir. 2001). *See also Nguyen v. Commissioner of Social Sec.*, 2008 WL 859425 *7 (E.D. Cal. 2008).

The ALJ appropriately limited counsel's inquiry because his definition of "fair" did not correspond to the terminology used in the Social Security system, which rates the degree of functional limitations due to mental impairments using the terms "none, "mild," "moderate," "marked" and "extreme." 20 C.F.R. § 404.1520a and 416.920a. (Tr. 142). Dr. Bruce testified that Kubu had no difficulties with activities of daily living, mild difficulties with social functioning, and moderate restrictions with concentration, persistence, and pace. As the vocational expert explained, even "moderate limitations are not going to exclude...jobs." (Tr. 142).

When counsel persisted with his request to pose a hypothetical framing Kubu's abilities as "fair"in those eight functional categories, the ALJ asked him to clarify his definition of the term. (Tr. 142-43). Counsel explained that a person with a "fair" ability to perform a specific job function would be completely unable to perform that function "15 percent of an 8-hour day," which would equate to a "an hour and 12 minutes a day." (Tr. 143). The ALJ and vocational expert both accepted that if a person were unable to work more than 85 percent of the

workday, he would not be able to engage in substantial gainful activity. (Tr. 143-44). Because that much was clear, the ALJ reasonably decided there was no need to have Kubu's counsel walk through each of those 8 eight categories and ask the vocational expert what she had already agreed to, that a person who was unable to work more than 85 percent of the day would be precluded from substantial gainful activity. And in any event, the vocational expert stated that her answer to questions regarding each of the eight categories would be precisely the same. Kubu has not shown that she was denied due process. Because the evidence was neither insufficient nor ambiguous on this point, the ALJ did not have a duty to develop the record any further by allowing counsel to ask additional questions of the vocational expert.

To the extent Kubu maintains the ALJ erred by not accepting that she was unable to perform all of those eight work-related functions more than 85 percent of the day and incorporating such a restriction into the residual functional capacity assessment, she is mistaken. As the vocational expert correctly pointed out, Kubu's counsel defined the term "fair" differently when he was questioning Dr. Bruce. (Tr. 143). He simply asked Dr. Bruce to consider "fair" as meaning a "15 percent reduction" in the ability to perform a certain task (Tr. 113), which is most reasonably understood as meaning a 15 percent reduction in overall efficiency

rather than a complete inability to perform the task for 15 percent of the day.  The ALJ permissibly relied instead on that portion of Dr. Bruce's testimony which characterized Kubu's mental limitations in terms contemplated by the Social Security regulations.

Kubu next argues the ALJ's hypothetical question to the vocational expert did not incorporate all of the limitations contained in the residual functional capacity assessment.  In particular, Kubue maintains the vocational hypothetical was incomplete because it omitted the following social limitations:  "brief and superficial interactions with 2-3 members of the general public on an occasional basis" and "brief and superficial one-on-one public interactions on a frequent basis."  Kubu argues this omission was prejudicial because it undermined the ALJ's step four finding that she was capable of performing her past relevant work as a switchboard operator, which involves significant interaction with people on the telephone.

The Commissioner concedes that the ALJ's step four finding was erroneous, but argues the error was harmless because the ALJ made alternative findings at step five.  The Court agrees.

While Kubu is correct that the ALJ's first hypothetical question did not include any social limitations, the ALJ added those limitations in his second

hypothetical. (Tr. 136-37). The vocational expert testified that the jobs he identified at step five, including office helper, counter clerk, and collator, would not be precluded by those additional limitations. (Tr. 137).

## IV. **Conclusion**

For all of the above reasons, the Court concludes that the ALJ's decision is based on substantial evidence and free of legal error. Accordingly,

IT IS RECOMMENDED that Kubu's motion for summary judgment be DENIED and the Commissioner's decision be affirmed.

DATED this 4th day of March, 2015

Jeremiah C. Lynch
United States Magistrate Judge